**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JOSE R. CABRERA JR., Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>TAHOE RESOURCES INC., RONALD W. CLAYTON, C. KEVIN McARTHUR, ELIZABETH DIANNE McGREGOR, and MARK T. SADLER,<br><br>Defendants. | **Case No.**<br><br>**<u>CLASS ACTION COMPLAINT</u>**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

**<u>CLASS ACTION COMPLAINT</u>**

Plaintiff Jose R. Cabrera Jr. ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against Defendants, alleges the following based upon personal knowledge as to itself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through its attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Tahoe Resources Inc. ("Tahoe" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons other than defendants who purchased or otherwise acquired Tahoe securities between April 3, 2013 and July 5, 2017, both dates inclusive (the "Class Period"), seeking to recover damages caused by defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      Tahoe, together with its subsidiaries, explores, develops, and operates mines in the Americas. The Company primarily produces copper, gold, silver, lead/zinc, and natural gas and petroleum, as well as precious metals assets.

3.      Formerly known as CKM Resources Inc., the Company changed its name to Tahoe Resources Inc. in January 2010.  Tahoe is headquartered in Reno, Nevada, and its stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "TAHO."

4.      On April 3, 2013, Tahoe announced that Guatemala's Ministry of Energy and Mines ("MEM") had granted the Company an exploitation license for the Escobal mine, a large silver mine located in the department of Santa Rosa in Southern Guatemala.

5.      Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Guatemala's MEM had granted the Escobal mining license to Tahoe's Minera San Rafael subsidiary without prior consultation with Guatemala's Xinca indigenous people; (ii) the foregoing constituted a violation of Guatemalan law and provided a basis for suspension of the Escobal license; (iii) consequently, the Company's revenues associated with the Escobal mining

2

license were unlikely to be sustainable; and (iv) as a result of the foregoing, Tahoe's public statements were materially false and misleading at all relevant times.

6.     On July 6, 2017, Tahoe disclosed that the Supreme Court of Guatemala had issued a provisional decision suspending the Escobal mining license of Minera San Rafael, a Tahoe subsidiary, in connection with a legal action brought by the human rights organization Centro de Acción Legal Ambiental y Social de Guatemala ("CALAS") against Guatemala's MEM.  CALAS alleges that MEM violated the Xinca indigenous people's right of consultation prior to granting the Escobal mining license.

7.     On this news, Tahoe's common share price fell $2.74, or 33.01%, to close at $5.56 on July 6, 2017.

8.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

9.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

10.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and Section 27 of the Exchange Act.

11.     Venue is proper in this Judicial District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b). Tahoe's securities trade on the NYSE, located within this Judicial District.

12.     In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

13.     Plaintiff, as set forth in the attached Certification, acquired Tahoe securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

14.     Defendant Tahoe is headquartered in Reno, Nevada, with principal executive offices located at 5310 Kietzke Lane, Reno, Nevada 89511.  The Company is incorporated in British Columbia, Canada.  Tahoe's shares trade on the NYSE under the ticker symbol "TAHO."

15.     Defendant Ronald W. Clayton ("Clayton") has served as Tahoe's Chief Executive Officer ("CEO") since August 2016 and as Tahoe's President since March 2014.  From March 2010 until August 2016, Clayton served as Tahoe's Chief Operating Officer.

16.     Defendant C. Kevin McArthur ("McArthur") served as Tahoe's Chief Executive Officer from November 2009 until April 2015 and from August 2015 until August 2016.

17.     Defendant Elizabeth Dianne McGregor ("McGregor") has served as Tahoe's Chief Financial Officer ("CFO") and Vice President since August 2016.

18.     Defendant Mark T. Sadler ("Sadler") served as Tahoe's CFO and Vice President from March 2013 until August 2016.

19.     The defendants referenced above in ¶¶ 15-19 are sometimes referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

4

**Background**

20.     Tahoe, together with its subsidiaries, explores, develops, and operates mines in the Americas. The Company primarily produces copper, gold, silver, lead/zinc, and natural gas and petroleum, as well as precious metals assets.

**Materially False and Misleading Statements Issued During the Class Period**

21.     The Class Period begins on April 3, 2013, when Tahoe issued a press release entitled "Tahoe's Escobal Project Receives Final Permit."  The press release stated, in relevant part:

> Tahoe Resources Inc. (TSX: THO, NYSE: TAHO) is pleased to announce that it has received the Escobal exploitation license from Guatemala's Ministry of Energy and Mines. Construction activities remain on-budget and on-schedule for mill commissioning in the second half of 2013 and commercial production in early 2014.

22.     On May 20, 2013, Tahoe issued a press release, concurrently filed as a Current Report on Form 6-K with the SEC, announcing the Company's financial results for the quarter ending March 31, 2013 (the "Q1 2013 6-K").  For the quarter, Tahoe reported a net loss of $24.9 million, or $0.17 per share.

23.     In the Q1 2013 6-K, Tahoe stated, in relevant part:

**Escobal Project Update**
The construction and underground development of the Escobal project is continuing on-schedule and on budget. Engineering, procurement and construction management was at 79 percent completion and underground development necessary for commencement of production was at 90 percent completion as of March 31, 2013. The Company completed 1,937 metres of underground development during the first quarter and 7,144 metres to date.

24.     On August 8, 2013, Tahoe issued a press release, concurrently filed as a Current Report on Form 6-K with the SEC, announcing the Company's financial results for the quarter

ending June 30, 2013 (the "Q2 2013 6-K").  For the quarter, Tahoe reported a net loss of $24.9

million, or $0.11 per share.

25.     In the Q2 2013 6-K, Tahoe stated, in relevant part:

**Escobal Project Update**

Construction and underground development of the Escobal project continues with
early mill commissioning commencing in late June 2013. Initial production of
metals concentrates is expected to begin in the late third quarter of 2013.

Second quarter underground advance was 2,080 metres with total advance project
to date at 9,221 metres. Access to 18 primary transverse and 18 secondary
transverse stopes from the 1290 and 1265 footwall laterals was achieved at the
end of the second quarter. Final development has been completed in the first five
stopes and production drilling is advancing in the first three stopes as expected.
Approximately 60,000 tonnes of mill feed stockpile is anticipated by mill start-up.
Each of the stopes contains 30,000 to 50,000 tonnes.

The project continues on schedule and on budget with full production anticipated
to commence in the first quarter of 2014. The Company believes it has sufficient
funds to complete construction and commence production.

26.     On November 12, 2013, Tahoe issued a press release, subsequently filed as a

Current Report on Form 6-K with the SEC, announcing the Company's financial results for the

quarter ending September 30, 2013 (the "Q3 2013 6-K").  For the quarter, Tahoe reported a net

loss of $15.5 million, or $0.11 per share.

27.     In the Q3 2013 6-K, Tahoe stated, in part:

**Escobal Project Update**

Mill commissioning continued through the quarter with first metals concentrate
being produced on September 30, 2013 and the first concentrate being shipped on
October 15, 2013. The Company plans to ramp-up to full production at the 3500
tpd level by the first quarter of 2014.

The team at Escobal completed 2,102 metres of underground development during
the quarter and 10,934 metres total to date. At the end of the quarter, ten stopes
(underground mining areas) were available for production and an additional ten
stopes were in final development. Stockpiled mill feed totaled 97,250 tonnes at an

estimated grade of 487 grams per tonne (g/t) silver, 0.4 g/t gold, 0.7% lead and 1.3% zinc.

All major components except the paste backfill plant have been fully commissioned to-date, and no impediments or bottlenecks to the 3500 tpd designed capacity have been identified. The paste plant is scheduled to be commissioned during the fourth quarter when the first mined-out stope is available for cemented backfill placement.

Mill optimization operations are underway to produce commercially viable metals concentrates to the specifications outlined in the May 2012 Preliminary Economic Assessment (PEA). This work is moving forward satisfactorily and regular concentrate shipments to smelters have been underway for the past several weeks. The present priorities are to bring the metals concentrate qualities up to commercial specifications and to increase mill throughput to 3500 tpd.

28.    On January 14, 2014, Tahoe issued a press release entitled "Tahoe Announces

Commercial Production At Escobal."  The press release stated, in part:

VANCOUVER, B.C. (January 14, 2014) – Tahoe Resources Inc. (TSX: THO, NYSE: TAHO) is pleased to announce that its Escobal mine in Guatemala has reached commercial production. Operations commenced in late September 2013 and production has been ramping towards the 3500 tonne per day (tpd) target level since that time.

Tahoe President and CEO Kevin McArthur said, "Our Guatemalan team has done a terrific job in delivering this world-scale silver mine within four years of the company's initial public offering. While we continue to optimize the mill, tailings filtration and paste backfill operations, this has been a remarkable start-up for a precious metals flotation plant over a very short time period."

"I am also pleased to report that we have commenced paying Guatemalan income taxes and look forward to making our first agreed upon royalty payments in the near future," added Mr. McArthur. "***Escobal mine has been designed and constructed to the highest environmental and social responsibility standards.*** We are very gratified to be working with our Guatemalan partners to bring sustainable benefits to a broad region of southeastern Guatemala through the development of Escobal."

(Emphasis added.)

29.    On March 13, 2014, Tahoe filed an Annual Report on Form 40-F with the SEC,

announcing the Company's financial and operating results for the quarter and year ended

December 31, 2013 the ("2013 40-F").  For the quarter, Tahoe reported a net loss of $9.57

million, or $0.07 per diluted share, on zero revenue, compared to a net loss of $24.92 million, or

$0.17 per diluted share, on zero revenue for the same period in the prior year.  For 2013, Tahoe

reported a net loss of $65.6 million, or $0.45 per diluted share, on zero revenue, compared to a

net loss of $93.45 million, or $0.65 per diluted share, on zero revenue for 2012.

      30.     In the 2013 40-F, with respect to its licenses regarding the Escobal mine, Tahoe

stated, in relevant part:

**PERMITS**

Operational activities at the Escobal mine are conducted under permits and licenses issued by MEM and MARN. All required permits for surface and underground activities are in place. The environmental approvals and requirements for the Escobal mine from MARN are specified in Resolution 3061-2011/DIGARN/ECM/beor, dated October 19, 2011. Exploitation activities are authorized by MEM through exploitation license LEXT 015-11, dated April 3, 2013 and through the export credential EXPORT –TI -13-2013, dated July 17, 2013 and amended on November 18, 2013.

**LEGAL**

On July 23, a Court of Appeals in Guatemala held that MEM should have conducted a hearing of a written opposition to the Escobal exploitation license during the permitting application process. The court did not rule on the substance or validity of the opposition; it merely stated that MEM was obligated to hold an administrative hearing addressing the substance of the opposition under the 1997 Mining Law. The Court did not invalidate or comment on the Escobal exploitation license in its decision. MEM issued a press release on July 24 stating that the ruling had no impact on the status of Escobal's exploitation license. MEM and the company have appealed the lower court's decision to the Constitutional Court. If the Constitutional Court upholds the Court of Appeals' decision, MEM will have to hear the opposition which it already stated it believes to be without merit. A public hearing was held on the issue in November 2013. The Constitutional Court is expected to issue a ruling in the case sometime in the next several months.

The Escobal exploitation license is required for the Company to operate the mill and to produce concentrate from the mine. All other permits required for continued exploration, construction and operations are in place. However, as the Escobal mine is the Company's sole project, if the exploitation permit for Escobal is unexpectedly suspended, the Company will be unable to generate revenue. As a result and under such circumstances, the Company expects this would adversely

impact its business, results of operations, financial performance and may result in default on the debt facility or reduction of workforce at the project.

31.     The 2013 40-F contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants McArthur and Sadler, certifying that the 2013 40-F "fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended" and that "the information contained in the Annual Report fairly presents, in all material respects, the financial condition and results of operation of the Company."

32.     On May 8, 2014, Tahoe issued a press release, concurrently filed as a Current Report on Form 6-K with the SEC, announcing the Company's financial results for the quarter ending March 31, 2014 (the "Q1 2014 6-K").  For the quarter, Tahoe reported net earnings of $24.8 million, or $0.17 per share.

33.     In the Q1 2014 6-K, Tahoe stated, in part:

**Tahoe Resources Inc.** (TSX: THO, NYSE: TAHO) today reported financial results for the quarter ending March 31, 2014 and provided a production update for its Escobal silver mine in Guatemala.

"We are extremely pleased with the Company's first quarter of commercial production," said Tahoe Chief Executive Officer Kevin McArthur. "The ramp-up to 3,500 tonnes per day (tpd) proceeded according to plan, and despite a handful of normal startup issues, the operations team maintained operating costs within expectations," he added.

"Furthermore, we have consistently delivered on promises to stakeholders. Escobal has been built to world standards, is a clean operation and is providing substantial economic benefits to the communities in Guatemala," added Mr. McArthur.

34.     On August 12, 2014, Tahoe issued a press release, concurrently filed as a Current Report on Form 6-K with the SEC, announcing the Company's financial results for the quarter ending June 30, 2014 (the "Q2 2014 6-K").  For the quarter, Tahoe reported net earnings of $36.1 million, or $0.25 per share.

35.     In the Q2 2014 6-K, Tahoe stated, in part:

Tahoe Chief Executive Officer Kevin McArthur said, "The ramp-up and optimization at Escobal were completed as planned during the second quarter. We are very happy with the outstanding team performance at the Escobal mine, and we continue to make great strides towards accomplishing our 2014 goals. In addition to posting strong operating and financial results for the quarter, we have positioned the Company's balance sheet to reflect a strong cash balance by year-end."

36.     On November 12, 2014, Tahoe issued a press release, concurrently filed as a Current Report on Form 6-K with the SEC, announcing the Company's financial results for the quarter ending September 30, 2014 (the "Q3 2014 6-K"). For the quarter, Tahoe reported net earnings of $20.0 million, or $0.13 per share.

37.     In the Q3 2014 6-K, Tahoe stated, in part:

Tahoe Vice Chair and CEO Kevin McArthur said, "We have produced strong free cash flow in each of our first three quarters of production and paid down $25 million of our term debt this quarter. As the Escobal mine approaches our goal of 18 to 21 million ounces of silver production in its first year, the time is right to initiate a dividend that we believe is sustainable and can grow over time."

38.     On March 11, 2015, Tahoe filed an Annual Report on Form 40-F with the SEC, announcing the Company's financial and operating results for the quarter and year ended December 31, 2014 the ("2014 40-F"). For the quarter, Tahoe reported net income of $9.84 million, or $0.07 per diluted share, on revenue of $65.4 million, compared to a net loss of $9.57 million, or $0.07 per diluted share, on zero revenue for the same period in the prior year. For 2014, Tahoe reported net income of $90.79 million, or $0.61 per diluted share, on revenue of $350.27 million, compared to a net loss of $65.6 million, or $0.45 per diluted share, on zero revenue for 2013.

39.     In the 2014 40-F, with respect to its licenses regarding the Escobal mine, Tahoe stated, in relevant part:

**LEGAL**

***APPEAL BEFORE THE CONSTITUTIONAL COURT***

On July 23, 2013, the Court of Appeals in Guatemala ("the Court") held that MEM should have conducted a hearing of a written opposition to the Escobal mine exploitation license during the permitting application process. The Court did not rule on the substance or validity of the license; it merely stated that MEM was obligated to hold an administrative hearing addressing the substance of the opposition under the 1997 Mining Law. The Court did not invalidate or comment on the Escobal mine exploitation license in its decision. MEM issued a press release on July 24, 2013 stating that the ruling had no impact on the status of the Escobal mine exploitation license. MEM and the Company have appealed the Court's decision to the Constitutional Court. If the Constitutional Court upholds the Court's decision, MEM will likely be compelled to hear the opposition which it already stated it believes to be without merit. A public hearing of the appeal was held in November 2013. The Constitutional Court is expected to issue a ruling in the case sometime in the near future.

. . .

**PERMITS**

Operations at the Escobal mine are conducted under permits and licenses issued by MEM and MARN. All required permits for surface and underground activities are in place. The environmental approvals and requirements for the Escobal mine from MARN are specified in Resolution 3061-2011/DIGARN/ECM/beor, dated October 19, 2011. Exploitation activities are authorized by MEM through exploitation license LEXT 015-11, dated April 3, 2013. The export of concentrates from the Escobal mine is licensed through MEM, with annual renewal requirements. The Company's export license (EXPORT-TI-17-2014) is current and valid.

40.     The 2014 20-F contained signed certifications pursuant to SOX by Defendants McArthur and Sadler, certifying that the 2014 40-F "fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended" and that "the information contained in the Annual Report fairly presents, in all material respects, the financial condition and results of operation of the Company."

41.     On April 28, 2015, Tahoe issued a press release, subsequently filed as a Current Report on Form 6-K with the SEC, announcing the Company's financial results for the quarter

ending March 31, 2015 (the "Q1 2015 6-K"). For the quarter, Tahoe reported net earnings of $31.9 million, or $0.22 per share.

42.     In the Q1 2015 6-K, Tahoe stated, in part:

**Escobal Update**
Mill throughput for the quarter was 335,174 tonnes at a silver grade of 500 grams per tonne (gpt). Development of the second mining front on the 1190 level is on track to meet the mid-year target. Commissioning of the fourth tailings filter is on schedule for the second quarter and the new paste plant is expected to be commissioned early in the third quarter, in advance of the 4500 tpd ramp-up.

43.     On August 11, 2015, Tahoe issued a press release, concurrently filed as a Current Report on Form 6-K with the SEC, announcing the Company's financial results for the quarter ending June 30, 2015 (the "Q2 2015 6-K"). For the quarter, Tahoe reported a net loss of $9.3 million, or $0.04 per share.

44.     In the Q2 2015 6-K, Tahoe stated, in part:

**Escobal Operations Update**

Average mill throughput for the quarter was 4,288 tonnes per day (tpd), with an average silver head grade of 422 grams per tonne (g/t).

Construction of the paste backfill plant is 85 percent complete, with final commissioning and start-up scheduled for September 2015. The Company anticipates annual cost reductions of $1 to $2 million per year when the new plant is operational.

Installation and commissioning of the fourth tailing filter press has been completed. The filter press is operating at design specifications allowing the mill to reach the planned expansion to the 4500 tpd throughput rate.

Installation of the second primary ventilation fan was near completion at the end of the second quarter with commissioning of the fan scheduled for the third quarter.

"We are very pleased with the progress at Escobal during the quarter," said Tahoe President and Chief Operating Officer Ron Clayton. "The expansion towards 4500 tpd is on schedule and on budget. As planned, our 2015 optimization program has been successful as demonstrated by the trend of unit cost reductions."

45.     On November 12, 2015, Tahoe issued a press release, subsequently filed as a Current Report on Form 6-K with the SEC, announcing the Company's financial results for the quarter ending September 30, 2015 (the "Q3 2015 6-K").  For the quarter, Tahoe reported net earnings of $13.3 million, or $0.06 per share.

46.     In the Q3 2015 6-K, Tahoe stated, in part:

"Both Escobal and La Arena continue to produce at very low operating costs," said Tahoe Executive Chair Kevin McArthur. "In addition, we set a new quarterly production record of 5.8 million ounces of silver at Escobal, while achieving record revenues of $145.7 million, and we nearly broke the prior cash flow record, despite lower metals prices. Our balance sheet remains very strong and the construction at Shahuindo is on track for the first gold pour in early 2016," he added.

. . .

**Escobal Operations Update**
Expansion construction activities are complete and Escobal is operating at the 4500 tpd throughput level. Cost optimization continues as illustrated in the table below, with approximately 20 percent reduction in operating cost from third quarter of 2015 compared to the same period in 2014.

47.     On March 24, 2016, Tahoe filed an Annual Report on Form 40-F with the SEC, announcing the Company's financial and operating results for the quarter and year ended December 31, 2015 the ("2015 40-F").  For the quarter, Tahoe reported a net loss of $107.72 million, or $0.55 per diluted share, on revenue of $154.89 million, compared to net income of $9.84 million, or $0.07 per diluted share, on revenue of $65.4 million for the same period in the prior year.  For 2015, Tahoe reported a net loss of $71.91 million, or $0.35 per diluted share, on revenue of $519.72 million, compared to net income of $90.79 million, or $0.61 per diluted share, on revenue of $350.27 million for 2014.

48.     In the 2015 40-F, with respect to its licenses regarding the Escobal mine, Tahoe stated, in relevant part:

**LEGAL**

***APPEAL BEFORE THE CONSTITUTIONAL COURT***

On July 23, 2013, the Court of Appeals in Guatemala ("the Court") held that MEM should have conducted a hearing of a written opposition to the Escobal Mine exploitation license during the permitting application process. The Court did not rule on the substance or validity of the license; it merely stated that MEM was obligated to hold an administrative hearing addressing the substance of the opposition under the 1997 Mining Law. The Court did not invalidate or comment on the Escobal exploitation license in its decision. MEM issued a press release on July 24, 2013 stating that the ruling had no impact on the status of the Company's exploitation license. On July 25, 2013, MEM and the Company appealed the Court's decision to the Constitutional Court and the Constitutional Court upheld the Court's decision, compelling MEM to conduct a hearing on the opposition that MEM already found to be without merit. The claimants subsequently requested a clarification from the Constitutional Court, which is currently pending.

. . .

**PERMITS**

Operations at the Escobal Mine are conducted under permits and licenses issued by MEM and MARN. All required permits for surface and underground activities are in place. The environmental approvals and requirements for the Escobal Mine from MARN are specified in Resolution 3061-2011/DIGARN/ECM/beor, dated October 19, 2011. Exploitation activities are authorized by MEM through exploitation license LEXT 015-11, dated April 3, 2013. The export of concentrates from the Escobal Mine is licensed through MEM, with annual renewal requirements. The Company's export license (EXPORT 41-15) is current and valid.

49.    The 2015 40-F contained signed certifications pursuant to SOX by Defendants McArthur and Sadler, certifying that the 2015 40-F "fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended" and that "the information contained in the Annual Report fairly presents, in all material respects, the financial condition and results of operation of the Company."

50.    On May 3, 2016, Tahoe issued a press release, subsequently filed as a Current Report on Form 6-K with the SEC, announcing the Company's financial results for the quarter

14

ending March 31, 2016 (the "Q1 2016 6-K").  For the quarter, Tahoe reported net earnings of

$35.5 million, or $0.16 per share.

51.     In the Q1 2016 6-K, Tahoe stated, in part:

**Escobal Operations Update**

Average mill throughput at the Escobal mine was 4,264 tonnes per day with an average silver head grade of 524 grams per tonne ("gpt") compared to average mill throughput of 3,724 tpd with an average silver head grade of 500 gpt in the first quarter of 2015. The mine produced metal concentrates containing 5.7 million ounces of silver, 3,298 ounces of gold, 2,738 tonnes of lead and 4,224 tonnes of zinc during the first quarter of 2016 compared to 4.6 million ounces of silver, 2,542 ounces of gold, 2,258 tonnes of lead and 3,410 tonnes of zinc for the same period in 2015. The average silver recovery to concentrates was 87.1% versus 85.0% in the first quarter of 2015.

During the first quarter of 2016, 5,474 dry metric tonnes of lead concentrate and 7,018 dry metric tonnes of zinc concentrate containing approximately 4.6 million payable ounces of silver were shipped and sold to third party smelters. Concentrate sales during the quarter generated $78.2 million in revenues at mine operating costs of $46.5 million resulting in mine operating earnings of $31.7 million.

Total cash costs per ounce of silver produced in concentrate, net of byproduct credits, for the first quarter of 2016 averaged $4.51, compared to $7.10 per ounce in the first quarter of 2015. AISC per ounce of silver, net of byproduct credits, averaged $5.97 per ounce versus $9.78 per ounce for the same period a year ago. Cost and productivity improvements in the mine and mill, coupled with favorable diesel fuel prices, continue to drive production costs lower.

52.     On August 10, 2016, Tahoe issued a press release, subsequently filed as a Current

Report on Form 6-K with the SEC, announcing the Company's financial results for the quarter

ending June 30, 2016 (the "Q2 2016 6-K").  For the quarter, Tahoe reported net earnings of

$57.9 million, or $0.19 per share.

53.     In the Q2 2016 6-K, Tahoe stated, in part:

**Silver Operations**
Escobal

Average mill throughput at the Escobal mine during Q2 2016 was 4,388 tonnes per day ("tpd") with an average silver head grade of 509 grams per tonne ("gpt") compared to average mill throughput of 4,288 tpd with an average silver head grade of 422 gpt in Q2 2015. The mine produced metal concentrates containing 5.7 million ounces of silver, 2,711 ounces of gold, 2,699 tonnes of lead and 4,037 tonnes of zinc during Q2 2016 compared to 4.5 million ounces of silver, 2,069 ounces of gold, 1,958 tonnes of lead and 2,954 tonnes of zinc for the same period in 2015. The average silver recovery to concentrates was 87.6% versus 84.8% in Q2 2015.

During Q2 2016, 6,024 dry metric tonnes of lead concentrate and 7,523 dry metric tonnes of zinc concentrate containing approximately 5.2 million payable ounces of silver were shipped and sold to third party smelters. Concentrate sales during the quarter generated $103.7 million in revenues at mine operating costs of $53.8 million resulting in mine operating earnings of $49.9 million. Cost and productivity improvements in the mine and mill, coupled with favorable diesel fuel prices, continue to drive production costs lower. Every 10% change in the price of diesel fuel impacts Escobal's total cash costs and AISC by approximately $0.10 per ounce. The average price of diesel fuel used in power generation in the first half of 2016 was $1.60 per gallon compared to an assumed price of $2.60 per gallon used for the Company's original 2016 cost guidance.

54.     On November 3, 2016, Tahoe issued a press release, subsequently filed as a Current Report on Form 6-K with the SEC, announcing the Company's financial results for the quarter ending September 30, 2016 (the "Q3 2016 6-K").  For the quarter, Tahoe reported net earnings of $63.0 million, or $0.20 per share.

55.     In the Q3 2016 6-K, Tahoe stated, in part:

Ron Clayton, Tahoe's President and CEO, commented, "We are well on the way to a record year in 2016, including achieving our key production and cost guidance. Escobal is having an outstanding year with both production and unit costs running at or better than expected levels. Driven by our strong results at Escobal, we are on track to pay over $35 million in royalties and taxes in Guatemala in 2016, in addition to paying approximately $20 million in wages and benefits and making significant direct investments in support of nutritional programs, education, skills training, agriculture and infrastructure development in the communities surrounding the mine. We have over 1,000 employees at Escobal, 97% of whom are Guatemalan. We very much appreciate the efforts of our employees and the strong support we receive from the surrounding community.

. . .

16

**Silver Operations**
<u>Escobal</u>

Average mill throughput at the Escobal mine during Q3 2016 was 4,472 tonnes per day ("tpd") at an average silver head grade of 444 grams per tonne ("gpt") compared to average mill throughput of 4,446 tpd at an average silver head grade of 508 gpt in the third quarter of 2015 ("Q3 2015"). The mine produced metal concentrates containing 5.0 million ounces of silver, 2,314 ounces of gold, 2,017 tonnes of lead and 2,974 tonnes of zinc during Q3 2016 compared to 5.8 million ounces of silver, 3,744 ounces of gold, 2,862 tonnes of lead and 4,033 tonnes of zinc for the same period in 2015. The average silver recovery to concentrates was 84.8% versus 87.1% in Q3 2015, with the reduction reflecting lower grades and the introduction of ore from the East Zone to the process plant.

During Q3 2016, 5,072 dry metric tonnes ("dmt") of lead concentrate and 5,845 dry metric tonnes of zinc concentrate containing approximately 4.8 million payable ounces of silver were shipped and sold to third party smelters compared to 6,687 dmt of lead concentrate and 6,113 dmt of zinc concentrate containing approximately 5.5 million payable ounces of silver shipped and sold during Q3 2015. Concentrate sales during the quarter generated $103.5 million in revenues at mine operating costs of $47.7 million resulting in mine operating earnings of $55.8 million. Concentrate sales for Q3 2015 generated $82.6 million in revenues at operating costs of $60.0 million resulting in a mine operating earnings of $22.6 million. Cost and productivity improvements in the mine and mill, coupled with favorable diesel fuel prices, continue to drive low production costs. Every 10% change in the price of diesel fuel impacts Escobal's total cash costs and AISC by approximately $0.10 per ounce. The average price of diesel fuel used in power generation in Q3 YTD 2016 was approximately $2.00 per gallon compared to an assumed price of $2.60 per gallon used for the Company's original 2016 cost guidance.

56.     On March 10, 2017, Tahoe filed an Annual Report on Form 40-F with the SEC, announcing the Company's financial and operating results for the quarter and year ended December 31, 2016 the ("2016 40-F").  For the quarter, Tahoe reported net income of $0.32 million, or zero per diluted share, on revenue of $189.4 million, compared to a net loss of $107.72 million, or $0.55 per diluted share, on revenue of $154.89 million for the same period in the prior year.  For 2016, Tahoe reported net income of $117.88 million, or $0.41 per diluted

share, on revenue of $784.5 million, compared to a net loss of $71.91 million, or $0.35 per diluted share, on revenue of $519.72 million for 2015.

57.     In the 2016 40-F, with respect to its licenses regarding the Escobal mine, Tahoe stated, in relevant part:

**LEGAL**

***APPEAL BEFORE THE CONSTITUTIONAL COURT***

On July 23, 2013, the Court of Appeals in Guatemala (the "Court") held that MEM should have conducted a hearing of a written opposition to the Escobal Mine Exploitation License ("Opposition") during the permitting application process. The Court did not rule on the substance or validity of the license; it merely stated that MEM was obligated to hold an administrative hearing addressing the substance of the Opposition under the 1997 Mining Law. MEM issued a press release on July 24, 2013 stating that the ruling had no impact on the status of the Company's exploitation license. On July 25, 2013, MEM and the Company appealed the Court's decision to the Constitutional Court and the Constitutional Court upheld the Court's decision, compelling MEM to conduct a hearing on the Opposition that MEM already found to be without merit. The claimants subsequently requested a clarification from the Constitutional Court, which the Court denied in early May 2016.

In June 2016, MEM commenced the hearing process and then suspended it indefinitely. The Opposition involves dated claims of prospective environmental harm (no such harm has materialized since production at Escobal began three years ago) and new claims of inadequate consultation. Based on the legal posture of the case, the lack of environmental harm after three years of operations and the extensive consultation process that MSR followed prior to issuance of the license, the Company expects a favorable ruling.

. . .

***PERMITS***

Operations at the Escobal Mine are conducted under permits and licenses issued by MEM and MARN. All required permits for surface and underground activities are in place. The environmental approvals and requirements for the Escobal Mine from MARN are specified in Resolution 3061-2011/DIGARN/ECM/beor, dated October 19, 2011. Exploitation activities are authorized by MEM through exploitation license LEXT 015-11, dated April 3, 2013. The export of concentrates from the Escobal Mine is licensed through MEM, with annual

renewal requirements. The Company's export license (EXPORT-TI-10-2016) is current and valid.

58.     The 2016 40-F contained signed certifications pursuant to SOX by Defendants Clayton and McGregor, certifying that the 2016 40-F "fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended" and that "the information contained in the Annual Report fairly presents, in all material respects, the financial condition and results of operation of the Company."

59.     On May 2, 2017, Tahoe issued a press release, concurrently filed as a Current Report on Form 6-K with the SEC, announcing the Company's financial results for the quarter ending March 31, 2017 (the "Q1 2017 6-K").  For the quarter, Tahoe reported net earnings of $74.7 million, or $0.24 per share.

60.     In the Q1 2017 6-K, Tahoe stated, in part:

**Another excellent quarter at Escobal** – Tahoe reported total **s**ilver production in Q1 2017 of 5.7 million ounces driven by strong results at Escobal. Q1 2017 silver production was 17% higher than the previous quarter and the highest quarterly production since Q1 2016 (5.7 million ounces). Total cash costs and all-in sustaining costs ("AISC") were $5.72 and $8.11 per ounce of silver produced, net of byproduct credits, respectively, better than the $6.48 and $9.76 per ounce recorded in Q4 2016 and well below the full-year target ranges included in the Company's 2017 guidance.

. . .

**Silver Operations**
Escobal

Mill throughput averaged 4,332 tonnes per day ("tpd") during Q1 2017. The mill processed a total of 0.4 million tonnes at an average silver head grade of 520 grams per tonne ("g/t") with an average silver recovery of 86% during the quarter. The mine produced metal concentrates containing 5.6 million payable ounces of silver, 2,500 ounces of gold, 2,200 tonnes of lead and 3,200 tonnes of zinc in Q1 2017. Silver production for the quarter compared favourably to full-year 2017 guidance and was 17% higher than the previous quarter and largely in line with Q1 2016 levels.

A total of 5.5 million ounces of silver in concentrate were sold in Q1 2017, which was approximately one million ounces more than was sold in Q4 2016 and Q1 2016. Concentrate sales during the quarter generated $113.1 million in revenues at mine operating costs of $53.5 million resulting in mine operating earnings of $59.6 million.

Total cash costs net of by-product credits for Q1 2017 were $5.72 per ounce, while AISC were $8.11 per ounce. Per ounce silver costs averaged below the target ranges included in the Company's full-year 2017 guidance and improved from Q4/16. Total cash costs in Q1 2017 were $1.21 per ounce or 27% higher than in Q1 2016, while AISC increased by $2.14 per ounce or 36% from the same quarter a year earlier. The increase in total cash costs and AISC was primarily the result of an additional $5.3 million in royalty expense during Q1 2017 as a result of the finalization of sales above the $16.00 per ounce threshold when compared to Q1 2016. AISC were also impacted by a $5.8 million increase in sustaining capital.

61.     The statements referenced in ¶¶ 21-60 were materially false and misleading because defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, defendants made false and/or misleading statements and/or failed to disclose that: (i) Guatemala's MEM had granted the Escobal mining license to Tahoe's Minera San Rafael subsidiary without prior consultation with Guatemala's Xinca indigenous people; (ii) the foregoing constituted a violation of Guatemalan law and provided a basis for suspension of the Escobal license; (iii) consequently, the Company's revenues associated with the Escobal mining license were unlikely to be sustainable; and (iv) as a result of the foregoing, Tahoe's public statements were materially false and misleading at all relevant times.

**The Truth Emerges**

62.     On July 6, 2017, Tahoe issued a press release, entitled "Guatemalan Lower Court Issues Ruling on Tahoe's Mining License."  The press release stated, in part:

VANCOUVER, British Columbia – July 5, 2017 – Tahoe Resources Inc. (TSX: THO, NYSE: TAHO) ("Tahoe" or the "Company") today reported that the Company has learned that the Supreme Court of Guatemala has issued a

provisional decision in respect of an action brought by the anti-mining organization, CALAS, against Guatemala's Ministry of Energy and Mines ("MEM"). The action alleges that MEM violated the Xinca Indigenous people's right of consultation in advance of granting the Escobal mining license to Tahoe's Guatemalan subsidiary, Minera San Rafael. The provisional decision is in respect of a request by CALAS for an order to temporarily suspend the license to operate the Escobal mine until the action is fully heard. The Company understands that no Xinca representative or community is currently participating in the CALAS lawsuit against MEM.

The provisional decision suspends the Escobal mining license of Minera San Rafael while the action is being reviewed by the court. The Company was not a party to the action commenced by CALAS and did not previously have standing to make submissions to the court in respect of the provisional application. This decision confers legal standing on the Company which will now take all legal steps possible to have the ruling reversed and the license reinstated as soon as possible, including immediately appealing the decision to the Constitutional Court.

. . .

While the Company cannot determine at this time when or if the suspension will be rescinded and the license will be reinstated, including for purposes of conducting a consultation process, we believe ILO 169 does not apply here, and if it did apply, was already met. We understand that the effect of ruling in favour of CALAS could mean that consultation must occur before the suspension is revoked. It could also mean, as happened in similar cases in Guatemala, that the court could allow operations to resume while a consultation process is conducted. We believe that the timeframe to undertake the consultation processes, and for a reconsideration of our application for the issue of the license, could be in the range of six to 12 months.

Upon formal receipt of the order temporarily suspending the license for Escobal, the mine will be placed on stand-by and is planned to be maintained in a manner such that full production can be expeditiously resumed on a reversal of the suspension. During this time, the Company will continue to maintain its high standard of security and environmental protection.

63.     On this news, Tahoe's common share price fell $2.74, or 33.01%, to close at

$5.56 on July 6, 2017.

64.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

65.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Tahoe securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

66.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Tahoe securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Tahoe or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

67.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

68.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

69.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by defendants' acts as alleged herein;

- whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Tahoe;

- whether the Individual Defendants caused Tahoe to issue false and misleading financial statements during the Class Period;

- whether defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Tahoe securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

70.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

71.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Tahoe securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Tahoe securities between the time the defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

72.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

73.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

74.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

75.     This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

76.     During the Class Period, defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Tahoe securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Tahoe securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

77.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Tahoe securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Tahoe's finances and business prospects.

78.     By virtue of their positions at Tahoe, defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, defendants

acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to defendants.  Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth.  In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

79.     Information showing that defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control.  As the senior managers and/or directors of Tahoe, the Individual Defendants had knowledge of the details of Tahoe's internal affairs.

80.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Tahoe.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Tahoe's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Tahoe securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Tahoe's business and financial condition which were concealed by defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Tahoe securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by defendants, and were damaged thereby.

81.     During the Class Period, Tahoe securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Tahoe securities at prices artificially inflated by defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Tahoe securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Tahoe securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

82.     By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

83.     As a direct and proximate result of defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)**

84.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

27

85.     During the Class Period, the Individual Defendants participated in the operation and management of Tahoe, and conducted and participated, directly and indirectly, in the conduct of Tahoe's business affairs.  Because of their senior positions, they knew the adverse non-public information about Tahoe's misstatement of income and expenses and false financial statements.

86.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Tahoe's financial condition and results of operations, and to correct promptly any public statements issued by Tahoe which had become materially false or misleading.

87.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Tahoe disseminated in the marketplace during the Class Period concerning Tahoe's results of operations.   Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Tahoe to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Tahoe within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Tahoe securities.

88.     Each of the Individual Defendants, therefore, acted as a controlling person of Tahoe.  By reason of their senior management positions and/or being directors of Tahoe, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Tahoe to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Tahoe and possessed the power to

control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

89.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Tahoe.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: July 7, 2017

                                        Respectfully submitted,

                                        **POMERANTZ LLP**

                                        */s/ Jeremy A. Lieberman*
                                        Jeremy A. Lieberman
                                        J. Alexander Hood II
                                        600 Third Avenue, 20th Floor
                                        New York, New York 10016
                                        Telephone:  (212) 661-1100

Facsimile:  (212) 661-8665
Email:  jalieberman@pomlaw.com
        ahood@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184
Email:  pdahlstrom@pomlaw.com

*Attorneys for Plaintiff*